**SUPERIOR COURT OF THE
STATE OF DELAWARE**

SHELDON K. RENNIE
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801

Date Submitted: November 12, 2025
Date Decided: February 26, 2026

Michael W. McDermott, Esquire
David B. Anthony, Esquire
Peter C. McGivney, Esquire
BERGER MCDERMOTT LLP
1105 N. Market St., 11th Floor
Wilmington, Delaware 19801
*Attorneys for Plaintiff.*

Kevin J. Mangan, Esquire
Zachary Murphy, Esquire
WOMBLE BOND DICKINSON (US)
LLP
1313 N. Market St., Suite 1200
Wilmington, Delaware 19801
*Attorneys for Defendant.*

RE:   *Mogo, Inc., v. Cricket Media, Inc.*
      C.A. No. N25C-05-263 SKR CCLD
      Defendant's Motion to Dismiss Plaintiff's Complaint

Dear Counsel:

This letter decision resolves Defendant's Motion to Dismiss Plaintiff's

Complaint. For the reasons explained below, the Motion is **DENIED.**

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This action involves the alleged nonpayment of a debt. On or about June 21,

2019, Defendant Cricket Media, Inc. ("Cricket") executed a Senior Secured

Convertible Promissory Note (the "Promissory Note") in favor of Plaintiff Mogo

Inc. ("Mogo") in the amount of $1,777,940.74.[1] As part of the same issuance, several other investors (the "Noteholders") entered into similar promissory notes (the "Notes"), totaling a $4,000,000 loan.[2] Cricket, Mogo, and the Noteholders also executed a Secured Note Purchase Agreement (the "Purchase Agreement") under which Mogo and the Noteholders received a security interest in "[a]ll personal property of [Cricket], whether presently existing or hereafter created or acquired[.]"[3] To facilitate the collective enforcement of the group's security interest, Mogo—the largest individual debt holder[4]—was designated as the "Collateral Agent" for the Noteholders.[5]

Cricket allegedly made only one required quarterly payment before ceasing payment on the debt.[6] The Promissory Note contains two definitions of "Default" relevant here. First, an "Inability to Pay Default," occurs if Cricket "admits in writing its inability to pay debts generally as they become due."[7] Second, a "Nonpayment Default," occurs if Cricket "fails to pay timely any of the principal, accrued interest, or other amounts due . . . and such failure shall continue for a period of 10 days."[8]

---

[1] D.I. 1 (hereinafter, "Compl."), Ex. 2. At the time of the issuance, Mogo was known as Difference Capital Financial Inc. Compl. at ¶ 4.
[2] *Id.*, Ex. 2 at Ex. A.
[3] *Id.*, Ex. 2 at Ex. D.
[4] *See Id.*, Ex. 2 at Ex. A.
[5] *Id.*, Ex. 2 at § 7.1.
[6] *Id.* at ¶ 25.
[7] *Id.*, Ex. 1 at § 5.3.
[8] *Id.*, Ex. 1 at § 5.1.

To initiate an action for Nonpayment Default, however, Mogo requires the support of Noteholders holding at least two-thirds of the outstanding principal amount of the Notes.[9]

Mogo initiated this action in May 2025, to recover the amount due under the Promissory Note.[10] The complaint asserts a single count for breach of contract, alleging various breaches of both the Promissory Note and the Purchase Agreement.[11] Cricket moved to dismiss under Rule 12(b)(6).[12] Central to this dispute is Mogo's allegation that Cricket breached the Purchase Agreement by failing to provide information regarding the other Noteholders.

## II.   STANDARD OF REVIEW

On a motion to dismiss under Superior Court Civil Rule 12(b)(6) "[t]he legal issue to be decided is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof."[13] Where such a motion is brought at the pleading stage, "a trial judge is not a robed gardener employing Rule

---

[9] *Id.*, Ex. 1 at § 5.
[10] *Id.* at Prayer for Relief ¶¶ 1–4.
[11] *See Id.* at ¶¶ 53–59.
[12] Cricket also moved to dismiss under Rule 12(b)(7), citing Mogo's failure to join the other Noteholders in connection with its pursuit of fees under Section 7.3 of the Purchase Agreement. D.I. 6 (hereinafter "Mot.") 21 n.8. However, in its opposition and at oral argument, Mogo clarified that its claim for fees against Cricket arises out of Section 6.5 of the Promissory Note. *See* D.I. 8 (hereinafter "Opp'n") 21–25. Because, as explained in this letter opinion, Mogo has pled a claim for breach of contract, the Court need not address this issue at this time.
[13] *L&L Broad. LLC v. Triad Broad. Co., LLC*, 2014 WL 1724769, at * 2 (Del. Super. Apr. 8, 2014) (quoting *Slayton v. Clariant Corp.*, 10 A.3d 597, 601 (Del. 2010)).

12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim."[14] Instead, at this stage, "the Court must consider a claim or counterclaim in its entirety."[15]

## III.  ANALYSIS

The Court will allow Mogo's singular count to proceed if it finds that it has properly pled a theory of breach of contract.[16] In conducting this analysis—rather than leap into the nuances of what written statements trigger an "Inability to Pay Default" or whether Mogo should be excused from the contractual requirements for a "Nonpayment Default"—the Court focuses on Mogo's allegation that Cricket breached the Purchase Agreement by refusing to provide information regarding the other Noteholders.

---

[14] *inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Jan. 26, 2021).

[15] *Id.* at *6.

[16] The Court is aware that, in some instances, pleading multiple theories of breach of contract under a single count could constitute an artful pleading tactic meant to preserve claims that may not otherwise survive. *See ET Aggregator, LLC v. PFJE AssetCo Hldgs. LLC*, 2023 WL 8535181, at *6–8 (Del. Super. Dec. 8, 2023) (discussing concerns with another one-count complaint). However, in this instance, the Court finds that discovery under any surviving claim of breach of contract will likely lead to relevant information regarding the other theories. For example, assuming each theory of breach had been pled separately, a finding that Cricket owed Mogo a duty to provide it with information about the other Noteholders would lead to the discovery of Cricket's payment or nonpayment of the other Notes and a dismissal of the other claims. Further assuming, for the sake of argument, that Cricket had not paid the other Noteholders, the interests of justice would demand allowing Mogo to resurrect a claim for Nonpayment Default after joining the other Noteholders. If Cricket had paid the other Noteholders, then Mogo's claim for a Nonpayment Default would not be barred by the majority holder requirement. In sum, Mogo's tactful pleading—in these circumstances—does little to serve strategic purposes.

Where, as here, "a motion to dismiss hinges on the interpretation of a contract, a trial court may only grant the motion if the defendants' interpretation of the contract is 'the *only* reasonable construction as a matter of law.'"[17] Even if the court considers one party's interpretation of a contract to be more reasonable, it is error on a 12(b)(6) motion, "to select the 'more reasonable' interpretation as legally controlling."[18]

Mogo posits that a reasonable reading of either Section 2.2 or 5.1 of the Purchase Agreement creates an obligation for Cricket to take actions that Mogo reasonably requests.[19] Section 2.2 of the Purchase Agreement states, in relevant part:

> [Cricket] shall execute and deliver to [Mogo] . . . at any time and from time to time, all financing statements, assignments, continuation financing statements, termination statements and other documents and instruments, in form reasonably satisfactory to the Purchasers and in any event consistent with the terms of this Agreement, and [Cricket] shall take all other action consistent with the terms of this Agreement, as [Mogo] may reasonably request, to perfect and continue perfected, maintain the priority of or provide notice of the security interest of [Mogo], for the benefit of the [Noteholders], in the Collateral.[20]

Section 5.1 of the Purchase Agreement reads:

> Until all of the Notes have been indefeasibly paid in full in cash or [converted], [Cricket] shall: . . . execute such further instruments and documents, and take such further action, as [Mogo] shall reasonably

---

[17] *LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1143 (Del. 2025) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

[18] *Id.* at 1144 (quoting *Appriva S'holder Litig. Co., LLC v. EV3 Inc.*, 937 A.2d 1275, 1292 (Del. 2007)).

[19] Opp'n 16–19.

[20] Compl., Ex. 2 at § 2.2.

request from time to time to give effect to this Agreement and carry out the transactions contemplated hereby.[21]

Alternatively, Mogo claims that there is an implied obligation to provide information about the other Noteholders.[22]

Cricket contends that the commitment in Section 2.2 is limited by language requiring it to act only "to perfect and continue perfected, maintain the priority of or provide notice of the security interest of [Mogo], for the benefit of the [Noteholders] in the collateral."[23] As to Section 5.1, which Cricket labels the "Further Assurances Clause,"[24] it argues that Mogo's requests for information "lacked reasonable necessity," because Mogo could have located the Noteholders or collateral itself.[25]

The Court agrees that the language of Section 2.2 is a more limited assurance that Cricket will act to insure that the Noteholders' security interest remains perfected. However, Section 5.1, by its plain terms, provides a broader assurance that Cricket will "take such further action as [Mogo] shall reasonable request . . . to give effect to [the Purchase Agreement] and carry out the transactions contemplated hereby."[26] None of the same limiting language is present there, suggesting that the intent was to provide assurance beyond those associated with Section 2.2.

---

[21] *Id.*, Ex. 2 at § 5.1.
[22] Opp'n at 18–19.
[23] Compl., Ex. 2 at § 2.2.
[24] Mot. at 16.
[25] *Id.* at 20.
[26] Compl., Ex. 2 at § 5.1.

"Further assurances provisions are a 'mechanism for confirming existing rights and obligations,' but they cannot 'be used to create new contractual commitments or to resolve ambiguities.'"[27] Both Cricket and Mogo cite caselaw that they argue controls the application of Section 5.1 to this dispute. One case cited by Mogo, *RTN Investors*, is particularly instructive.[28] The loan agreement in that case required the debtor to furnish the creditor "such other information, in such for as the [creditor] may reasonably request from time to time."[29] When the debtor failed to provide the requested financial statements the court considered this alongside other breaches and concluded that the creditor, could not reasonably be expected to continue its own performance.[30]

Here, Section 5.1 provides a broad promise that Cricket will "execute such further instruments and documents, and take such further action, as [Mogo] shall reasonably request from time to time to give effect to [the Purchase Agreement] and to carry out the transactions contemplated hereby."[31] Although this language does not explicitly use the word "information," the Court is not persuaded that the absence

---

[27] *Lighthouse Behavioral Health Solutions, LLC v. Milestone Addiction Counseling, LLC*, 2023 WL 3486671 (Del. Ch. May 17, 2023)(quoting *Hawkins v. Daniel*, 273 A.3d 792, 828–29 (Del. Ch. 2022)).

[28] *RTN Investors, LLC v. RETN, LLC*, 2011 WL 862268 (Del. Super. Feb. 10, 2011). The other case Mogo cited in support of this point, *Comerica Bank*, relied on interpretation of a contractual provision defining certain information as the property of the party seeking it. *Comerica Bank v. Global Payments Direct, Inc.*, 2014 WL 3779025, at **8–9 (Del. Ch. Aug. 1, 2014).

[29] *RTN Investors*, 2011 WL 862268 at *10.

[30] *Id.* at *15.

[31] Compl., Ex. 2 at § 5.1.

of that word limits Cricket's commitment to comply with reasonable requests, including those for information regarding other Noteholders.

Cricket points to three cases to argue that Section 5.1 cannot be interpreted to include an obligation to provide such information. However, each of those cases involve far more onerous requests than a mere request for information: one involved an attempt to force a commercially unreasonable lease;[32] another sought to force a party to drop a nonfrivolous lawsuit;[33] and the third attempted to shift a contractual obligation to another party.[34]

The request here is distinguishable. Mogo is the "Collateral Agent" for the other Noteholders.[35] Should Mogo need to foreclose on the Collateral, it must determine how to apply the proceeds it holds for the benefit of those Noteholders. Without knowing who the current Noteholders are or how to contact them, Mogo could not reasonably fulfill its role under the Purchase Agreement.

---

[32] *See Liberty Prop. L.P. v. 25 Massachusetts Ave. Prop. LLC*, 2008 WL 1746974, at *17 (Del. Ch. Apr. 7, 2008), *aff'd*, 970 A.2d 258 (Del. 2009) ("To get its desired end, Republic has to convince me that 25 Mass had a contractual duty to enter a lease that no commercial lessor would have accepted simply to facilitate Republic's exercise of its option. I am not convinced.").
[33] *See Liberty Prop. L.P. v. 25 Massachusetts Ave. Prop. LLC*, 2009 WL 224904, at **6–7 (Del. Ch. Jan. 22, 2009) ("More fundamentally, I think it strains the contractual words to turn Republic's refusal to abandon a non-frivolous claim for specific performance of its Option right into a refusal to take action to effect a contractually contemplated transaction.").
[34] *See Lighthouse Behavioral Health Solutions, LLC v. Milestone Addiction Counseling, LLC*, 2023 WL 3486671 (Del. Ch. May 17, 2023) ("Neither the further assurances clause nor the cooperation clause imposes the obligation to obtain patient consents on Lighthouse.").
[35] Compl., Ex. 2 at § 7.1.

Cricket also argues that the request is unreasonable because Mogo could have used the signature page of the Purchase Agreement[36] and a Schedule of Purchasers[37] to locate the Noteholders itself. While those documents list the names of the original purchasers, they do not include contact information or indicate whether the Notes have been transferred over the last six years.[38] It is possible that, with enough diligence, Mogo could unilaterally locate the original holders and verify any subsequent transfers. However, Mogo bargained for Section 5.1 to avoid the necessity of such a search. As the debtor, Cricket has significantly greater access to information about who is receiving (or not receiving) payments. A request for Cricket to provide the information it has, in accordance with its contractual commitment, is not unreasonable.

Section 5.1 does not require Cricket to "scour the Earth" for the Noteholders. However, in connection with its commitment to take such further action as Mogo reasonably requests to fulfill the purposes of the Purchase Agreement, Cricket does have a contractual duty to provide the information it possesses regarding other Noteholders. Mogo alleges that Cricket has failed to do so.[39] This constitutes a well-

---

[36] *Id.*, Ex. 2
[37] *Id.*, Ex. 2 at Ex. A.
[38] Opp'n 21 n.7.
[39] Compl. at ¶ 51.

pleaded theory of breach, which has plausibly damaged Mogo by improperly limiting its ability to pursue claims for nonpayment.

Because Mogo has pled a claim that survives under Rule 12(b)(6), the Court will not, at this time, set about pruning Mogo's alternative theories for breach of contract. Accordingly, the Motion is **DENIED.**

## IV.   CONCLUSION

For the reasons set forth above, the Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED THIS 26th DAY OF FEBRUARY 2026.**

_____
**Sheldon K. Rennie, Judge**